5-2085                                333 S. W. 2d 490

Opinion delivered March 28, 1960.

*John L. Hughes*, for appellant.

*Joe E. Purcell*, for appellee.

GEORGE ROSE SMITH, J. This is a boundary line dispute. A. C. Tull, who owns 26 acres west of the disputed line, brought suit to quiet his title in accordance with a fence that existed for about 35 years. The defendants, Orville Ashcraft and his wife, who own six acres east of the line, contended that the fence did not represent the boundary and that the true line, according to the Government survey, was 35 feet west of the fence. The chancellor found that the fence had not been recognized as a division fence, and upon that finding he fixed the line in conformity with the Government survey. Tull has appealed.

We have concluded that the decree is against the weight of the evidence, for in our opinion the long-continued existence of the fence is decisive of the case.

Both tracts were formerly owned by the appellant's father, John M. Tull. In 1922 the elder Tull sold the

east six-acre tract to his son-in-law, W. H. Ashcraft, whose son is the appellee Orville Ashcraft. W. H. Ashcraft took possession of his land, and in 1922 or 1923 he erected the fence in question. He testified that in placing the fence he started at his neighbor's line to the east and stepped off what he thought to be 110 yards, which was the width of his own property. Although he erected the fence and evidently tried to put it on the line W. H. testified that he did not recognize it as the line: ''I figured all the time I was short.'' He does not say, however, that he communicated his doubts to anyone at all, and he admits that the fence remained in place for about 35 years, being kept up by the succeeding landowners. W. H. was not asked how long he lived on the property, but we infer that he moved away long ago, as his son Orville testified that he was brought up in a different part of the county. It was not until 1955 that Orville bought the land from Vada Hawkins and returned to his father's former home. At the trial there was no testimony from anyone whose ownership intervened between that of the two Ashcrafts.

On the other side of the fence the appellant, who is Orville's uncle, has been in possession of his tract ever since he purchased it from his father in 1926. Tull testified without contradiction that he was in undisturbed possession for 33 years, that the fence was always considered to be the line, and that the fence was maintained by the adjoining owners until part of it was taken down a year or so before the trial. Not only is there no contradiction of Tull's testimony; it is corroborated by his brother and to some extent by W. H. Ashcraft, an adverse witness, who, as we have seen, admits that the fence remained in its original place for about 35 years.

Upon this testimony it cannot be doubted that Tull has acquired title to the disputed strip by adverse possession. We have frequently held that when adjoining landowners silently acquiesce for many years in the location of a fence as the visible evidence of the division line and thus apparently consent to that line, the fence line becomes the boundary by acquiescence. *Deidrech* v.

*Simmons,* 75 Ark. 400, 87 S. W. 649; *Robinson* v. *Gaylord,* 182 Ark. 849, 33 S. W. 2d 710; *Seidenstricker* v. *Holtzendorff,* 214 Ark. 644, 217 S. W. 2d 836. As we said in a very similar case, *Gregory* v. *Jones,* 212 Ark. 443, 206 S. W. 2d 18: "It is true that in this case the original rail fence line was established without a prior dispute as to boundary; but the recognition of that line for the many intervening years (34 in this case) shows a quietude and acquiescence for so many years that the law will presume an agreement concerning the boundary."

In deciding the case as he did the chancellor evidently relied upon the appellees' testimony, which was largely directed to showing that Tull, after the present dispute arose, at first conceded the surveyed line to be the boundary. It is shown that Tull did not object to the line's being surveyed and that when the line was found to be west of the fence Tull recognized his nephew's rights by removing some young fruit trees he had planted on the strip in controversy. On the witness stand Tull candidly admitted that when he understood that Orville wasn't getting the acreage that the elder Tull had sold many years ago he (the appellant) at first thought that he was supposed to defend the old title, "but since that time it was called to my attention the 7 year law would hold in this case; therefore I ceased to be interested."

Tull's conduct did not affect his title, for it had vested many years before by adverse possession. We stated the rule in *Shirey* v. *Whitlow,* 80 Ark. 444, 97 S. W. 444: "This continuous possession for the statutory period, if adverse, divested plaintiff and his grantor of the title, and gave it to defendant, and the mere fact that the defendant afterwards in conversation with plaintiff recognized the justness of his claim to the land did not divest the title from defendant or estop him from asserting such title." Later cases to the same effect include *Stroud* v. *Snow,* 186 Ark. 550, 54 S. W. 2d 693, and *Hart* v. *Sternberg,* 205 Ark. 929, 171 S. W. 2d 475.

Reversed.

Harris, C. J., and McFaddin, J., dissent.

Ed. F. McFaddin, Associate Justice, (Dissenting). This is a boundary line case between adjoining land-owners and relatives. In dispute is a strip 35 feet wide east and west, and 1320 feet long north and south. The appellee (defendant below) claims to the legal survey line; and the appellant (plaintiff below) claims to a fence line by (a) adverse possession, and (b) by long established boundary.

J. A. Tull, father of the appellant, was the common source of title. In 1922 J. A. Tull conveyed to the appellee's grantor the east one-fourth of a certain 40-acre tract;[1] and in 1926 J. A. Tull conveyed to the appellant the west three-fourths of the same 40-acre tract.[2] The boundary line between the said east one-quarter and the west three-quarters of the 40-acre tract is the line in dispute.

Appellant claims that he has all the time been in possession up to a certain fence, which he claims is the long established boundary; and also that a maple tree on that line was a recognized landmarker. The man who erected the fence testified that he began where he thought the east line of the 40 acres was, and stepped off 110 yards to the west, and then erected the fence in question. He testified that it was never recognized by anyone as being a real boundary line fence, but was only a fence for convenience. The same witness, and others, testified that appellant never claimed the said fence was the line until just a short time before this litigation; that appellant went to see appellee just before the litigation and suggested that a survey be made to determine the true boundary; that when the survey was made it was discovered that the true boundary was 35 feet west of the fence; that appellant then asked appellee's permission to remove — and did remove — some young peach trees from the 35-foot strip; and that appellant then told appellee that the other peach trees on the 35-foot strip belonged to the appellee.

[1] There was a 4-acre square in the northeast corner that was reserved, but the 4-acre tract is immaterial to this litigation.

[2] There was a reservation of a 4-acre tract in the northwest corner, but this reservation is immaterial.

All of the foregoing testimony had a direct and pertinent bearing on whether the defendant had the intention to hold adversely up to the fence line. The testimony certainly showed that there had never been the essentials of an agreed boundary. When the appellant was examined about these matters, the following occurred:

"Q. You never have claimed that the fence was on the line have you?

A. I am claiming it now.

Q. You are claiming it now?

A. Always claimed it.

Q. Did you offer to pay for a part of the cost for surveying that property?

A. Yes, sir.

Q. Have you paid for a part of the cost?

A. No, sir.

Q. Did you have some reason for changing your mind?

A. Yes, sir.

Q. What was the reason?

A. Well, I started to tell you a while ago. At that time I understood Orville felt like he wasn't getting ten acres that his father had sold him and that he didn't have ten acres in the beginning. The measurements might have been in error I knew and I felt that I was supposed to defend the old title made that he was to get ten acres but since that time it was called to my attention the 7 year law would hold in this case therefore I ceased to be interested.

Q. Who told you about the seven year law?

A. I found out."

The appellant's testimony, as copied, shows that appellant originally thought that he would have to defend appellee's title to the true line (since appellant's father had conveyed the land to the appellee's grantor); and it was not until after the survey that appellant learned of the

"7-year law" (which clearly means seven years adverse possession under the Statute of Limitations), and that after learning of the "7-year law" appellant then decided to claim adversely up to the fence. This shows that appellant did not have for seven years the intention to claim adversely. In *Collins* v. *Bluff City Lbr. Co.*, 86 Ark. 202, 110 S. W. 806, this Court held that title to land could not be acquired by possession for the statutory period, unless the possession be adverse. In *Vittitow* v. *Burnett*, 112 Ark. 277, 165 S. W. 625, a party in possession of land wrote to another, acknowledging the latter as the owner; and this Court held that the title of the party in possession was not adverse, since it was not of a hostile character. In *Britt* v. *Berry*, 133 Ark. 589, 202 S. W. 830, the plaintiff's husband encroached on the defendant's land by permission and the plaintiff did not notify the defendant that she was holding adversely, so she acquired no adverse possession. In *Fulcher* v. *Dierks Lbr. Co.*, 164 Ark. 261, 261 S. W. 645, this Court held that if the holding of land began by permission, such holding did not ripen into adverse or hostile right until notice was brought home to the owner, and then the adverse holding had to be continued thereafter for the statutory period. In view of these, and many other cases, I maintain that Mr. Tull did not establish adverse possession or a long established boundary. It is my view that the Chancery decree should be affirmed.

Therefore, I respectfully dissent to the reversal by this Court; and the Chief Justice joins in this dissent.